**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL A. BROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.   09 C 4144 |
| v. | ) | |
| | ) | |
| CITY OF AURORA, a municipal | ) | HONORABLE DAVID H. COAR |
| corporation, CITY OF AURORA POLICE | ) | |
| OFFICERS, G. LILL #128, WROBEL #258, | ) | |
| and D. RASHKOW #126, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael Brooks has filed suit under 42 U.S.C. § 1983 and Illinois law against the City of Aurora and three of its police officers (Officers George Lill, Garrett Wrobel, and Douglas Rashkow), alleging, among other things, false arrest, false imprisonment, and excessive force in violation of the Fourth Amendment.  The defendants have moved for summary judgment.  For the reasons given below, their motion is GRANTED.

**FACTS[1]**

On June 18, 2008, around 5:45 p.m. Officers George Lill and Matthew Hix of the Aurora Police Department were conducting surveillance of the La Baguette Bakery at 930 N. Farnsworth Road in Aurora, Illinois for possible narcotics transactions.  Beyond that, Brooks and the officers tell two very different stories about the events giving rise to this lawsuit.  The court sets forth the relevant facts as it must construe them, namely in the light most favorable to Brooks, and it

---

[1] The parties' L.R. 56.1 submissions are rife with factual disputes or other factual allegations that are immaterial to the issues presented here.  Moreover, many of Brooks's submissions in his reply to Defendants' L.R. 56.1 statement are replete with argument.  For the sake of clarity and concision, the court does not include these various submissions here.  Instead, it limits its statement of facts to those that are material to the present motion.

- 1 -

recounts Defendants' conflicting version of events where doing so facilitates understanding of the issues presented by this motion.

Officer Hix contends that, during the surveillance operation, he noticed a silver Crown Victoria with custom rims turning westbound onto Sheffer Road from Farnsworth Road while watching the flow of people in and out of the bakery. As the vehicle passed in front of them, Hix asked Lill, "Is that Michael Brooks?" The officers could recognize Brooks and the vehicle "almost immediately" because they would see both "pretty frequently." In particular, they knew Brooks from the Maple Terrace Apartments, an apartment complex operated by the Aurora Housing Authority, where Brooks was a resident and the officers were or had been members of the Community Oriented Policing Division. The vehicle turned into and traveled through the parking lot that the officers were watching. Lill observed the vehicle for 10-15 seconds, and both officers got a good look at the driver; they were "absolutely positive" it was Brooks.

That made Lill suspicious. He would usually see Brooks's wife, Vicky Pryor, driving the Crown Victoria; indeed, this was the first time he had ever seen Brooks driving it. So he ran a LEADS check on Brooks, which revealed that his driver's license had been suspended. At the same time, the officers received a general dispatch to respond to a burglary in progress, which they did. Afterwards, they went back to the parking lot where they had seen Brooks but were unable to find him. Lill filled out a traffic ticket for Brooks, filed a police report indicating that he had observed Brooks driving on a suspended license, and completed a synopsis sheet and affidavit summarizing the basis for his application for an arrest warrant for Brooks. After Lill's sergeant approved his paperwork, the warrant application was forwarded to the Kane County State's Attorney's Office. A judge issued a warrant for Brooks's arrest on a charge of driving on a suspended license. Lill did not appear in court in connection with the warrant application.

Brooks, however, denies that the officers observed or could have observed him driving the Crown Victoria on June 18. Brooks testified, both by affidavit and at his deposition, that the Crown Victoria had broken down earlier in June; specifically, the voltage regulator, a solenoid switch that forms part of the ignition system, was burnt out. Since the vehicle would not even start, it was marooned in the Maple Terrace parking lot on June 18. Brooks had been waiting to get paid so that he could purchase the needed part, and a receipt from Carquest Auto Parts in Aurora indicates that he purchased a new solenoid for a "1992 full size Ford" on June 19, 2008. Further, Jacqueline Foster, a resident of Maple Terrace Apartments, testified by deposition that Brooks's vehicle was inoperable at the time. She knew because Brooks's wife usually drove her to the grocery store. Theresa Aguda, another neighbor, also testified that the vehicle was disabled sometime in June 2008, although she could not recall whether it was disabled on June 18 in particular. Brooks, for his part, testified at his deposition that he took the bus to and from work on June 18. The bus normally dropped him home around 5:40, and to the best of his recollection, that is where he would have been (if not still on the bus) at the time Officers Lill and Hix claim he was driving the Crown Victoria. He was nowhere near the area of 930 N. Farnworth Avenue on June 18.

Roughly three weeks later, on July 9, 2008, Lill met with Officers Rashkow and Wrobel to discuss meeting up at the Maple Terrace Apartments to patrol and, if Brooks was present, to execute the arrest warrant. Maple Terrace was not part of Lill's assigned patrol; as Lill testified, he was assigned to District 2 at the time, whereas Maple Terrace is in District 8, where he had been previously assigned and had become quite familiar with Maple Terrace and its residents. Lill rode solo in his patrol car (Hix, his partner, was on vacation at the time; hence his ad hoc alliance with Rashkow and Wrobel) while Rashkow and Wrobel rode together in theirs.

Shortly after 9 p.m., Lill pulled in to the Maple Terrace parking lot and saw Brooks sitting in a chair near the sidewalk, in the company of a couple other people. Lill ran another LEADS check on Brooks to determine whether the arrest warrant was still valid, which it was. He informed Rashkow and Wrobel that Brooks was at Maple Terrace, and they immediately made their way over "for officer safety reasons." Lill parked in the east parking lot, approached Brooks, and asked him to step over to the side to talk. They walked about twenty feet and began to talk. The parties agree that Lill asked Brooks whether he knew that his driver's license was suspended and that Brooks said yes. They also agree that Lill asked Brooks whether he knew that there was a warrant out for his arrest, that Brooks said he did not know, and that Brooks asked what the warrant was for. When Lill told him, Brooks denied that he had been driving on June 18. What happened after that is a matter of considerable dispute.

Brooks's version of events, as he told it at his deposition, goes as follows. He explained to Lill that his vehicle was inoperable and that Lill could not have seen him on June 18. Lill responded by telling Brooks that he was under arrest. Brooks said "okay;" he just wanted to go tell his wife that they were headed to the police station and ask her to bring his wallet and ID down to the station for him. Brooks "backtracked" or "back pedaled" away from Lill, towards his window, to call to his wife. At some point, Lill said something to the effect of, "[n]o, you're not going nowhere," or "you're not talking to nobody;" Brooks's testimony sometimes suggests this happened before he began to back away, but at other times Brooks clearly says it happened after he began to back away. In any event, when Lill asked him why he was walking away after being told that he was under arrest, Brooks said, "I'm walking because I want to know what the reason was." Brooks took a couple of steps backwards, turned around, and then Lill "came up behind" him. At that point, Brooks had turned back around, and Lill grabbed at Brooks's arm or

wrist, attempting to get control of him.  Lill again told Brooks he was under arrest and sprayed him in the face with "mace."  (More precisely, it was oleoresin capsicum, more commonly known as pepper spray).  Brooks threw up his arms in an effort to protect himself from the spray.  Lill told him to get down, and Brooks went down, voluntarily, falling over a lawn chair.  When he was on the ground, someone—Brooks thinks it was Officer Rashkow—sprayed him again.  Brooks contends that the officers never called for an ambulance or procured any other assistance in ameliorating the effects of the pepper spray before transporting him to the police station.

Foster and Aguda both testified that the incident was laced with racial obscenities from Lill.  Foster testified that as Lill initially approached Brooks, he said "I got you nigger" and then grabbed Brooks, slung him down, and sprayed him.  Aguda testified that Lill approached Brooks and said, "You fucking nigger, you trying to run, you trying to get away from us."  Brooks then yelled up to his wife to come down with his wallet and ID.

The parties have submitted identical copies of a video-only recording of part of the incident.  There is no dispute that the recording was made with a video camera mounted on the dashboard of Rashkow and Wrobel's squad car that activated automatically when they turned on their lights and siren.  As the squad car begins to turn into Maple Terrace, the video shows Brooks running backwards away from Lill.  Brooks's arms are up and flailing, and Lill is attempting to grab hold of them.  Lill catches up to Brooks (who has been moving backwards and thus facing Lill the whole time) and Brooks puts his arms straight out to the sides at shoulder height.  As the squad car continues turning at this point—it had stopped to allow a bicycle to pass—there is a two-second interval during which the incident is not captured.  Rashkow arrives on the scene just as the video resumes.  At that point, Lill has his left arm fully extended with his left hand on Brooks's chest.   At arm's length, he sprays Brooks in the face with pepper spray for

one or two seconds.  Still standing, Brooks bends over and tries to wipe his face with his shirt.  Lill sprays him again, from a couple of feet away (nearly the entire width of the sidewalk), for no more than one second.  This time, Brooks goes down, falling over a lawn chair.  Lill and Rashkow handcuff Brooks while he is laying on his stomach, conduct a search of his person, and sit him upright on the ground.  He remains there for the rest of the video, which lasts approximately five minutes from this point.  The officers allow one of the other individuals present to wipe the pepper spray from Brooks's eyes and face with a towel.

Brooks was arrested and charged with driving on a suspended license and resisting a peace officer.  He was transported to the Aurora Police Department, booked, and bonded out after spending the night in jail.  At a bench trial, Brooks was acquitted of both charges.

## **SUMMARY JUDGMENT STANDARD**

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law.  Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party," *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001), and must avoid any temptation to resolve "swearing contests" or make credibility judgments.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

The nonmoving party, in turn, may not rest on the allegations in his pleadings or conclusory statements in affidavits; he must support his contentions with evidence that would be admissible at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c).  To avoid summary

judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## ANALYSIS

### *False Arrest*

A plaintiff who claims he was arrested in violation of the Fourth Amendment must show that he was arrested without probable cause. *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). A police officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge would support a reasonable belief that the suspect has committed or is committing an offense. *See id.* The court may decide the question at summary judgment "[o]nly if the underlying facts claimed to support probable cause are not in dispute." *Id.* (citing *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)).

Brooks was arrested on two charges: driving on a suspended license, 625 ILCS 5/6-303(a), and resisting a peace officer, 720 ILCS 5/31-1(a). As Defendants point out, a finding of probable cause to believe that Brooks committed either offense will defeat his false-arrest claim. Although the parties focus on the driving-on-a-suspended-license charge in their briefs, the court begins—and ends—with the resisting-arrest charge.

Section 5/31-1(a) of the Illinois Criminal Code provides that "[a] person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor." It is well settled under Illinois law that the resistance or obstruction "must be physical; mere argument will not suffice." *Payne*, 337 F.3d at 776 (Illinois citations omitted). But any physical act "that impedes,

hinders, interrupts, prevents or delays the performance of the officer's duties" will suffice. *People v. Haynes*, 927 N.E.2d 819, 824 (Ill. App. Ct. 2010) (citing *People v. Raby*, 240 N.E.2d 973 (Ill. 1968)). Moreover, it would not help Brooks to argue that he did not believe that there was a warrant out for his arrest or that any such warrant could be valid; a suspect may not resist an arrest just because he believes—even if correctly—that the arrest is unlawful. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008) (Illinois citations omitted); s*ee also* 720 ILCS 5/7-7.

Brooks admitted that he knew Lill was a police officer and that Lill told him he had a warrant for Brooks's arrest. He further admitted that Lill told him he was under arrest *before* he began to "backtrack" toward his house. The video shows Brooks running backwards, his raised and flailing arms thwarting Lill's attempts to grab and restrain him. That Brooks was, on his own account, just going to tell his wife to fetch his wallet did not give him license to run from an arresting officer. An arrest is nothing if not a restraint on a suspect's freedom of movement; indeed, an arrest occurs precisely when a reasonable person would not feel free to leave. *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 626-28 (1991); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1017 (7th Cir. 2006); *Leaf v. Shelnutt*, 400 F.3d 1070, 1089-90 (7th Cir. 2005). Thus, Brooks was not free to move about for his own purposes once Lill told him he was under arrest. At a minimum, Lill could reasonably believe that Brooks was "imped[ing]," "hinder[ing]," and certainly "delay[ing]" an arrest and execution of a warrant by committing a physical act, *see Haynes*, 927 N.E.2d at 824, and that gave Lill probable cause to arrest Brooks for the offense of resisting a peace officer. *See* 720 ILCS 5/31-1(a). Brooks's false-arrest claim therefore fails, and there is no need to take up the hotly contested matter of Brooks's arrest for driving on a suspended license. Defendants are entitled to summary judgment.

Brooks's complaint also asserts a claim under § 1983 for false imprisonment. (*See* Compl., Count IV.) Defendants have not moved for summary judgment on Count IV, apparently because they mistakenly believe that only two counts in the complaint—those for false arrest and excessive force—"state a federal claim." (*See* Mot. Summ. J. ¶1.) Not so: false imprisonment, like false arrest, is actionable under § 1983. *See, e.g.*, *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). However, "[p]robable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Id.* It therefore follows from the court's ruling on Brooks's false-arrest claim that his false-imprisonment claim must fail for precisely the same reasons. Since these are reasons the parties have had ample opportunity to address, the court grants summary judgment on Brooks's § 1983 false-imprisonment claim.

*Excessive Force*

Brooks contends that by deploying pepper spray under these circumstances, the officers used excessive force to effectuate an arrest, in violation of the Fourth Amendment. The officers have asserted qualified immunity, so Brooks must establish (1) that the facts, taken in the light most favorable to him, show that the defendants violated his right to be free from force that was not "reasonably necessary" to effectuate the arrest, *see e.g.*, *Gonzalez*, 578 F.3d at 539; and (2) that this right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court, exercising its sound discretion, may decide these questions in whatever order is best suited to the case at hand. *Pearson*, 129 S. Ct. at 818.

Principles of constitutional avoidance counsel against deciding questions of constitutional law when the case at hand can be resolved without doing so. *See id.* at 821. Accordingly, the

court first asks whether it was clearly established that the use of pepper spray would constitute excessive force under these circumstances. "Since the purpose of qualified immunity is to protect public officials from guessing about constitutional developments at their peril, the plaintiff[] ha[s] the burden of showing that the constitutional right was clearly established." *Gonzalez*, 578 F.3d at 540 (citation omitted). This burden can be carried by showing that there is "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Id.* (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). In the absence of controlling precedent from this circuit, the court may "look to other circuits to ascertain whether there was such a clear trend in the case law that the recognition of the right by a controlling precedent was merely a matter of time." *Escobedo v. Bender*, 600 F.3d 770, 782-83 (7th Cir. 2010).

Brooks relies principally on *Escobedo* to show that the use of pepper spray in these circumstances violated clearly established law. *See* 600 F.3d 770. *Escobedo* is insufficient for at least three reasons. First, *Escobedo* could not have put Defendants on notice, since it was issued nearly two years after the events in question. Second, even at that late date, the Seventh Circuit noted that there was still no controlling circuit precedent on when the use of "tear gas and other disabling chemical agents" constituted excessive force. *Id.* at 783. Third, the facts of *Escobedo* are too far afield to show that it was "merely a matter of time" before an analogous case made its way to the Seventh Circuit. In *Escobedo*, police officers attempted to "extricate" a potential suicide from an apartment bedroom where he had isolated himself by setting fire to an exterior room; deploying tear gas and flash-bang grenades into the bedroom, rendering Escobedo blind and deaf; and then shooting him to death. *Id.* at 773. Such extreme facts fail to show that Lill

should have already known that, in due course, conduct such as his would be deemed excessive. *Escobedo* is therefore of little or no help to Brooks.

*Escobedo* was not the first time the Seventh Circuit noted the lack of controlling circuit precedent; in *Graham v. Hildebrand*, it noted that it had never addressed a qualified immunity defense involving the use of pepper spray. *See* 203 F. App'x 726, 731 (7th Cir. 2006) (nonprecedential disposition); *see also Bloomer v. Williams*, No. 05-4071, 2007 U.S. Dist. LEXIS 51483 (C.D. Ill. July 17, 2007) (same; citing *Graham*). But the Seventh Circuit did note a broad agreement among other circuits as to general principles: an officer's use of pepper spray is reasonable when the individual sprayed was either resisting arrest or refusing reasonable police requests, but excessive when used gratuitously on an individual who is in custody, incapacitated, or otherwise passive. *See Graham*, 203 F. App'x at 731.

Taking a broader view of the law, other circuits have clearly established that the use of pepper spray on an arrestee who is already handcuffed or otherwise effectively restrained by officers is excessive. *See Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (arrestee already handcuffed and seated in patrol car); *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002) (both of suspect's arms restrained by officers when spray deployed); *Park v. Shifflet*, 250 F.3d 843, 852-53 (4th Cir. 2001) (officers sprayed suspect after throwing her against a wall and handcuffing her); *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (suspect handcuffed when sprayed). And it is excessive and unreasonable to use pepper spray for an extended period of time, *see id.*, or at needlessly close range, *see Park*, 250 F.3d at 852-53.

At the opposite end of the spectrum, it is clearly established that the use of pepper spray is reasonable when the arrestee is actively thwarting arrest by fighting, *Jackson v. City Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001) (suspect instigated fight with arresting officer),

- 11 -

*Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000) (arrestee and officer "struggling on floor" when spray deployed), or clearly flouting a police command, leaving officers to fear for their safety, *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995) (suspect refused to remove hand from pocket potentially housing dangerous weapon after being ordered to do so), or has been clearly warned that the officer will discharge pepper spray if the suspect does not comply immediately with a command, *Monday v. Oullette*, 118 F.3d 1099, 1104-05 (6th Cir. 1997).

This clearly established law does not show that a reasonable officer would have known that the use of pepper spray as Lill used it was excessive and unreasonable. Brooks was not already handcuffed or otherwise subdued. He began to run from an arresting officer despite being told that he was under arrest, and he was sprayed within seconds after the officer caught up with him. True, he had stopped running by the time he was sprayed, but the court must remain mindful that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Here, too, the fact that Brooks says he was just going to talk to his wife is to no avail; Brooks was not free to leave, and when he did, an officer reacting in the moment was not obliged to take his explanations at face value. *See Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) ("No law that we know of required [the officer] to take [the arrestee's] apparent surrender at face value, a split second after [the arrestee] stopped running."). Qualified immunity protects (among other things) this need to make split-second decisions by leaving "ample room for mistaken judgments," whether of fact or of law. *See Payne*, 337 F.3d at 776 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *Pearson*, 129 S. Ct. at 815. Thus, even if Lill's deployment of pepper spray constituted excessive force, which the court need not and does not decide, Brooks has not shown that it was

unreasonable in light of clearly established law at the time of the incident.

In short, Brooks cannot point to any case in this or any other circuit that clearly establishes the illegality of Lill's conduct. Since qualified immunity will protect an officer who has violated a constitutional right if the contours of the right were not so clear that a reasonable officer would have known at the time that he was violating the law, *Saucier*, 533 U.S. at 202, Defendants are entitled to summary judgment on the basis of qualified immunity.

*State-Law Claims*

Brooks's complaint also asserts several state-law causes of action. This court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a). However, "[t]he presumption [is] that when a federal suit is dismissed before trial, the court should relinquish any supplemental state law claim to the state courts." *Beck v. Dobrowski*, 559 .3d 680, 686 (7th Cir. 2009); *see* 28 U.S.C. § 1367(c)(3). Accordingly, Brooks's state-law claims are dismissed without prejudice so that Brooks may pursue them in state court if he so chooses.

## CONCLUSION

For the foregoing reasons, the court GRANTS summary judgment as to all federal-law claims (Counts I, IV, VII) and relinquishes supplemental jurisdiction over the remaining state-law claims.

Enter:

/s/ David H. Coar

---

David H. Coar

United States District Judge

**Dated: August 30, 2010**